IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SHIRLEY M. ATWELL,          )
                            )
          Plaintiff,        )
                            )
     v.                     )     Case No.
                            )     05-0519-CV-W-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,         )
                            )
          Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Shirley Atwell seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding plaintiff not credible, in evaluating plaintiff's mental impairment, and in relying on the testimony of the vocational expert. I find that the substantial evidence in the record supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On August 29, 2002, plaintiff applied for disability benefits alleging that she had been disabled since January 1, 1995. Plaintiff's disability stems from respiratory

problems, arthritis, breast cancer, and depression.
Plaintiff's application was denied on November 26, 2002. On
June 22, 2004, a hearing was held before an Administrative
Law Judge. On September 1, 2004, the ALJ found that
plaintiff was not under a "disability" as defined in the
Act. On April 4, 2005, the Appeals Council denied
plaintiff's request for review. Therefore, the decision of
the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides
for judicial review of a "final decision" of the
Commissioner. The standard for judicial review by the
federal district court is whether the decision of the
Commissioner was supported by substantial evidence. 42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401
(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir.
2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);
Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The
determination of whether the Commissioner's decision is
supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision. Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,

2

876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.

3

42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

4

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

>           Yes = disabled.
>           No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

>           No = not disabled.
>           Yes =  go to next step where burden shifts to
Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

>           Yes = disabled.
>           No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Marianne Lumpe, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1966 through 1991:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1966 | $    273.00 | 1979 | $     0.00 |
| 1967 |      72.80 | 1980 |       0.00 |

| | | | |
|---|---:|---|---:|
| 1968 | 1,239.60 | 1981 | 0.00 |
| 1969 | 3,602.52 | 1982 | 0.00 |
| 1970 | 528.15 | 1983 | 0.00 |
| 1971 | 711.04 | 1984 | 0.00 |
| 1972 | 51.20 | 1985 | 524.28 |
| 1973 | 0.00 | 1986 | 4,721.83 |
| 1974 | 0.00 | 1987 | 4,721.33 |
| 1975 | 0.00 | 1988 | 3,398.91 |
| 1976 | 0.00 | 1989 | 52.00 |
| 1977 | 0.00 | 1990 | 2,846.88 |
| 1978 | 0.00 | 1991 | 1,271.10 |

(Tr. at 59).

**Report of Contact**

On November 6, 2002, Elizabeth Page of Disability Determinations telephoned plaintiff for clarification as to whether she had been taking Paxil[1] (Tr. at 86). The report reads as follows:

> I called to clarify if she is or is not taking her
> Paxil as this needed to be clarified per the physical
> CE [consultative exam]. She has been taking Paxil @ 20
> mgs a day since 1991 when her mother-in-law died.
> Because of their money situation there have been times
> when she has gone without. Currently the pharmacy in
> Eldorado Springs has allowed them to make payments so
> she could be on the Paxil through the recent death of
> her brother. I asked specifically about January of
> this year when the evidence indicates she had a time of
> not sleeping and crying non-stop. She said that was

---

[1]Paxil is used to treat depression and anxiety.

6

when she was not taking her medication the way she was
supposed to.  She had tried to cut back to half a pill
a day to make the pills last longer.  She says that
when she takes her medicine as she is supposed to she
functions pretty well.  She has never been hospitalized
and has never received any therapy or treatment for her
depression.  She really traces all this back to the
death of a very controlling overbearing mother-in-law
that she could never please.

She has currently moved in with her mother for a while.
. . .

(Tr. at 86).

**B.    *SUMMARY OF MEDICAL RECORDS***

January 1, 1995, is plaintiff's alleged onset date;

however, there are no relevant medical records for 1995

until August of that year.

On August 11, 1995, plaintiff saw Rick D. Casey, D.O.,

for evaluation of congestion and depression (Tr. at 99).

Examination revealed her lungs had slight expiratory wheezes

with decreased breath sounds.  She was assessed with asthma

and depression.  Dr. Casey prescribed Paxil and Atrovent

inhaler.

There are no relevant medical records for 1996, 1997,

1998, or most of 1999.

On November 29, 1999, plaintiff was seen by Dr. Casey

due to a sore throat and bilateral ear discomfort (Tr. at

98).  She had been aching all over.  Dr. Casey diagnosed

7

upper respiratory infection.

On December 30, 1999, plaintiff saw Dr. Casey for a follow up (Tr. at 97). She said she felt like she hurt her right knee a couple of months earlier. Since that time, it had been bothering her, especially when she went up and down steps. She was on her feet all day and it caused some discomfort. She said that it did not feel right. She also noted her shoulders were sore. She said she did a lot of lifting and did not feel like she could lift over her head and put her arms behind her back very well. Examination of the shoulders demonstrated reasonable passive range of motion. Plaintiff did not have good internal rotation, worse with the left shoulder than the right. Her grip strength was adequate. Examination of the right knee revealed some mild popping with McMurray testing[2]. Dr. Casey diagnosed probable arthritis of the shoulders and right knee

---

[2]When performing the McMurray test, the examiner bends the knee toward the buttock as far as it will comfortably flex and then straightens out the leg while rotating the ankle inward. The test is then repeated while rotating the ankle outward. If there a pop, clunk or thud that can be felt or heard by the examiner, the test is considered positive and suggests the presence of torn cartilage on one side of the knee. This test may be helpful to distinguish torn cartilage from other types of knee injuries or damage, such as ligament rupture, arthritis or problems with how the kneecap moves over the front of the knee.

discomfort secondary to cartilage injury.  Plaintiff was
given a sample of Arthrotec [non-steroidal anti-
inflammatory] for her shoulders.  Dr. Casey also recommended
performing shoulder exercises.

On April 5, 2000, plaintiff was seen by Dr. Casey with
complaints of a productive cough, chest discomfort,
headaches, fevers and chills, and drainage (Tr. at 96-97).
Physical examination revealed close breath sounds with soft
expiratory wheezes in the right base.  There were also soft
rales throughout.  Her current medications included Paxil 20
mg daily.  She was assessed with pneumonitis [inflammation
of lung tissue] and arthritis.  Dr. Case prescribed an
Albuterol inhaler[3], Avelox [antibiotic], and Celebrex [non-
steroidal anti-inflammatory].

On May 19, 2000, plaintiff saw Dr. Casey for a follow
up (Tr. at 96).  She was taking Paxil and Prednisone[4].

_____

[3]Albuterol is a bronchodilator. It works by relaxing
muscles in the airways to improve breathing.

[4]Prednisone is in a class of drugs called steroids.
Prednisone reduces swelling and decreases the body's ability
to fight infections.  Prednisone is used to treat many
different conditions.  It is used to treat endocrine
(hormonal) disorders when the body does not produce enough
of its own steroids.  It is also used to treat many
disorders such as arthritis, lupus, severe psoriasis, severe
asthma, ulcerative colitis, and Crohn's disease.

9

On June 27, 2000, plaintiff saw Dr. Casey with complaints of injury to her right wrist following work (Tr. at 96).  She had the problem for three days and considered it moderately worse in the past 12 hours.  She was assessed with tendinitis and sprained wrist.

On October 13, 2000, plaintiff saw Dr. Casey and complained of "acute and chronic anxiety panic" (Tr. at 96).  Dr. Casey prescribed Paxil and DARE +C [I have been unable to determine what DARE +C is].  He noted that plaintiff seems to do well with her depression when she takes Paxil.

On January 15, 2002, plaintiff saw Dr. Casey and complained of shortness of breath, depression, and insomnia (Tr. at 94).  She said she had been experiencing these problems for a long time and considered this problem chronic.  Dr. Casey diagnosed periodic asthma, depression, and insomnia. He prescribed Trazodone[5], Proventil[6], and Paxil.

On February 19, 2002, plaintiff saw Dr. Casey and complained of cough, sore throat, headache, and nasal

_____

[5]Trazodone is an anti-depressant used to treat depression and insomnia.

[6]Proventil is the same medication as Albuterol, a bronchodilator.  It works by relaxing muscles in the airways to improve breathing.

10

congestion with increased drainage (Tr. at 93). She
appeared moderately distressed and anxious. She had
bronchial rales on respiratory examination. Dr. Casey
diagnosed pneumonia.

On August 21, 2002, Steven Butcher, D.O., completed a
Medical Report including Physician's Certification/
Disability Evaluation (Tr. at 191-192). Plaintiff said she
is unable to work because of breathing problems and her
depression caused crying and irritability. Plaintiff was
taking Paxil and Albuterol. Dr. Butcher noted diminished
right pulmonary function with late inspiratory wheezes
bilaterally. Plaintiff's affect was bland and tense. She
was unable to squat down and get up. She had limited right
shoulder flexion. Dr. Butcher assessed chronic obstructive
pulmonary disease (dyspnea [shortness of breath] walking one
block, climbing stairs), depression, panic disorder,
probable degenerative joint disease of the knees, and
probable bursitis of the right shoulder. The form asks the
doctor to summarize his findings, and he wrote, "limited
ability to exert self, limited ability to withstand job
stresses."

The following week, on August 29, 2002, plaintiff filed
her application for disability benefits.

11

On October 10, 2002, plaintiff was examined by Holly
Chatain, Psy.D., a licensed psychologist, after having been
referred by the Division of Family Services (Tr. at 193-
195). Dr. Chatain's report reads in part as follows:

ASSESSMENT INSTRUMENTS AND EVALUATIVE PROCEDURES:
Millon Clinical Multiaxial Inventory-III (MCMI-III),
structured clinical interview with client.

BACKGROUND INFORMATION: . . . She completed high
school. Her employment history includes working at
flea markets and restaurants. She is currently
unemployed. . . . She denied having any history of
inpatient and/or outpatient psychiatric and/or
psychological treatment. She denied having any history
of suicide and/or homicide attempts. She denied having
any history of hallucinations and/or delusions. She
denied having any history of mania and/or hypomania.
She denied having any history of verbal, physical, or
sexual abuse. . . . She is currently prescribed Paxil,
although has been taking her brother's since she is
financially unable to refill her prescription. . . .
She denied having any sleep disturbance. She denied
having any appetite disturbance. She reported having a
history of mood instability since 1991 including crying
for no apparent reason, worry, irritability, although
she denied having any suicidal thoughts. . . . She
reported that she has healthy self-esteem. She
identified her husband's loss of his employment and
subsequent financial problems as current stressors.
For leisure activity, she enjoys ironing.

BEHAVIORAL OBSERVATIONS: . . . Eye contact was
appropriate. Her mood was somewhat depressed, although
her affect was anxious throughout the assessment
process. . . . Memory functioning appeared impaired,
as she had difficulty recalling time sequences, dates,
and events during the clinical interview. . . . She
appeared to comprehend what was said to her and spoke
openly during the clinical interview.

12

MILLON CLINICAL MULTIAXIAL INVENTORY - III
Similar profiles of the MCMI-III suggest a moderate
"fake bad" response set in which similar adults
exaggerated problems. This may affect the validity of
the following test findings, as test results are
probably an exaggerated, distorted overstatement of
their symptoms/problems. Mild signs of depression and
severe levels of anxiety are reported. . . .

DIAGNOSTIC IMPRESSIONS:
Axis I:   Generalized Anxiety Disorder
Axis II:  Dependent Personality Disorder, Provisional
                    * * * * *
Axis IV:  Inadequate finances, husband's loss of
          employment
Axis V:   GAF = 55[7] (current)

SUMMARY AND RECOMMENDATIONS:  . . .  Despite Shirley's
test taking attitude, which reduced the validity of
current results, her psychological functioning is
impaired due to anxiety. She presented with a history
of crying for no apparent reason, worry, and
irritability since 1991. However, she reported that she
has always been "a people pleaser", which would account
for her dependent characteristics. At this time, it is
recommended that Shirley be referred to outpatient
individual psychological treatment to address the above
issues and continue medication monitoring by her
prescribing physician.

On October 28, 2002, plaintiff saw Robert King, D.O.,

who evaluated her for disability (Tr. at 102-104).  His

report states in part as follows:

She was last gainfully employed 15 years ago at
Halfmoon Retreat in Harrisonville as a waitress. She

---

[7]A Global Assessment of Functioning ("GAF") of 51 to 60
means moderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning
(e.g., few friends, conflicts with peers or co-worker).

13

quit and has not applied anywhere. She has not had any
interviews and she has not looked for work since that
time. She said she used to clean houses for cash but
decided to quit that when her husband supported her.
She is married and has two sons and one daughter. She
[formerly smoked] 1.5 packs times twenty years but quit
twenty years ago. She denies alcohol or recreational
drug use. She said a typical day for her is to get up
about 7:30 in the morning. She does personal hygiene
in the evening five to six times weekly. She does not
eat breakfast. She said she will do her housework and
chores, sit around and watch TV depending upon the day
and then eat lunch about 11:00. She said she will play
computer games, watch TV or sit around in the
afternoon. About 8:00 she eats supper. She will watch
TV until about 11:00 and goes to bed.

Dr. King noted that plaintiff's affect was moderately
flattened. "Based upon today's physical exam, it appears to
me the primary concern of the patient is inadequately
treated depression. Working outside the home would help the
patient with this depression situation. Therefore, I find
nothing to prevent this patient from being gainfully
employed." (Tr. at 102-104).

On November 3, 2002, plaintiff's husband called Dr.
Casey's office and stated that plaintiff was not improving
on Paxil (Tr. at 190). He said that plaintiff was sitting
facing the wall and crying, she had not slept in four days.
Because plaintiff was in Kansas City and not close to Dr.
Casey's office, he recommended that plaintiff's husband take
her to a local urgent care or ER clinic to be seen. There

14

are no corresponding medical records to suggest that plaintiff saw any medical professional after Dr. Casey's recommendation.

On November 18, 2002, plaintiff had chest x-rays done at Truman Medical Center (Tr. at 117, 180). The x-rays showed degenerative changes in the spine. Impression: "No heart enlargement. No pulmonary infiltrate or failure pattern. Post inflammatory calcification. Small ovoid pulmonary nodular density adjacent to the left cardiac border. This may be a granuloma or some scarring. Would recommend comparison with prior studies." Plaintiff also had an ultrasound of her left breast which confirmed an abnormal mass which had been detected on a mammogram (Tr. at 119, 121, 178, 187). The doctor recommended a biopsy.

On November 22, 2002, plaintiff saw Benoit Bloneau, M.D., regarding the abnormal mass in her breast (Tr. at 115, 185). He ordered a needle biopsy.

On November 26, 2002, G. Sutton, Ph.D., a psychologist, completed a Psychiatric Review Technique (Tr. at 105-107). He found that plaintiff's impairment, depression and anxiety with panic attacks, is not severe. He found that plaintiff suffers from mild restrictions of activities of daily living; mild difficulties in maintaining social functioning;

15

mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (Tr. at 108). In support of these findings, Dr. Sutton wrote: "55 year [old] claimant alleges disability due to depression and other physical problems. She takes Paxil on a regular basis and seem[s] to function quite well while on it. She has no history of hospitalization or diagnosis by a mental health professional. Her impairment is non-severe." (Tr. at 110).

On December 3, 2002, plaintiff had a biopsy of her left breast performed at Truman Medical Center (Tr. at 112-113, 183, 209). The tumor was diagnosed as carcinoma.

On December 19, 2002, plaintiff underwent a left modified radical mastectomy performed by Benoit Bloneau, M.D. (Tr. at 175-176, 205).

On February 25, 2003, plaintiff had a right subclavian port-a-cath[8] inserted by John M. Webb, M.D., at St. Mary's Hospital (Tr. at 203-204).

---

[8]A port-a-cath is a device that is used to make administration of chemotherapy easier. It can also reduce the risk of certain chemotherapy-related complications. This device is placed under the skin, in the upper part of the chest. It has a small reservoir that is connected to a major vein inside the chest. This device facilitates administration of chemotherapy into the venous system.

On August 18, 2003, plaintiff was seen at St. Mary's Hospital by Daniel Keleti, M.D. (Tr. at 132-134). Portions of Dr. Keleti's report read as follows:

> HISTORY OF PRESENT ILLNESS: . . . [Plaintiff had] a modified radical mastectomy on 12/19/2002. There was still residual tumor measuring 1.7 cm and there were 3 out of 6 lymph nodes involved with cancer and the pathologist noted that the actual number of lymph nodes may have been underestimated since there were confluent and necrotic lymph nodes and there was infiltration into the perinodal soft tissue. She went on to receive chemotherapy from 2/2003 until 8/2003. . . . She now presents for consideration for chest wall radiation therapy.
>
> PAST MEDICAL HISTORY/PAST SURGICAL HISTORY: The patient has a history of depression, asthma, tubal ligation in 1974, operation for a hammertoe in 1979 and also had a Port-A-Cath placed in 1/2003.
>
>                * * * * *
>
> REVIEW OF SYMPTOMS: . . . The patient has arthritic joints in the knees. . . . The patient gets short of breath when she has claustrophobic attacks in enclosed spaces. . . . The patient has had some numbness in her fingers after chemotherapy. She does have pain in her knees which she rates as a 7 out of 10 from arthritis.
>
> PHYSICAL EXAMINATION: . . . She has trace lymphedema[9] in her left upper extremity. . . .
>
> LABORATORY AND X-RAY DATA: . . . The patient's chest x-ray from 4/15/2003 revealed no acute cardiac or pulmonary abnormality. A bone scan on 2/18/2003 revealed findings within the shoulders and knees consistent with degenerative joint disease.

---

[9]Lymphedema is an accumulation of excessive proteins, edema, chronic inflammation, and fibrosis secondary to the impairment of the lymph vessels.

17

ASSESSMENT:  The patient has a stage IIIA left breast
cancer status post modified radical mastectomy and
chemotherapy.

PLAN:  I offered the patient postoperative chest wall
and regional lymph node radiation. . . .  I also asked
her to have an updated completed metabolic panel,
complete blood count checked at this point and I had
her scheduled for a simulation so she can start
radiation treatments.

(Tr. at 132-134).

On August 19, 2003, plaintiff had her first radiation
treatment at St. Mary's Hospital (Tr. at 140).

On August 26, 2003, plaintiff was seen at Truman
Medical Center for a follow up (Tr. at 131).  Her bone scan
revealed increased activity within the shoulders and knees
consistent with degenerative joint disease.  She was given
samples of Celebrex.

Also on August 26, 2003, plaintiff received a radiation
treatment at St. Mary's Hospital (Tr. at 140).  She
complained of right shoulder discomfort.

On September 4, 2003, plaintiff had x-rays taken of her
right humerus due to shoulder and arm pain and a history of
breast cancer (Tr. at 135).  The x-rays were normal.

On September 9, 2003, plaintiff was seen at Truman
Medical Center for a follow up (Tr. at 131).  The doctor
noted plaintiff had slight discomfort of her right shoulder

18

during rotation.  X-ray of right shoulder was unremarkable, and plaintiff reported that Celebrex helps relieve her shoulder pain.  Plaintiff was given samples of Celebrex and a prescription for more Celebrex.

On September 16, 2003, plaintiff was seen at Truman Medical Center (Tr. at 130).  She reported a slight decrease in energy level.  Her right arm was causing her discomfort.

On September 24, 2003, plaintiff was seen at Truman Medical Center for a follow up (Tr. at 130).  She denied being tired and had no tenderness.

On September 30, 2003, plaintiff was seen at Truman Medical Center for a follow up (Tr. at 129).  She denied a decrease in energy.

On October 7, 2003, plaintiff was seen at Truman Medical Center for a follow up (Tr. at 129).  She denied a significant decrease in her energy level.  She was given 21 samples of Celebrex to take once a day.

On October 14, 2003, plaintiff saw Clinton Pickett, D.O., at Truman Medical Center (Tr. at 153, 157).  Her chief complaint was right shoulder pain.  Dr. Pickett ordered x-rays which showed minimal degenerative spurring at the acromioclavicular joint of the shoulder.  The anterior acromion had minimal degenerative changes.  The glenohumeral

19

joint appeared to be without degenerative changes. There was no fracture or dislocation noted. On exam, plaintiff had symmetrical range of motion on both shoulders. She could abduct her shoulders approximately 170 degrees. Dr. Pickett assessed myositis/tendonitis to the anterior deltoid right shoulder and ordered physical therapy. He recommended that plaintiff continue taking Celebrex.

On October 20, 2003, plaintiff saw Daniel Keleti, M.D., at St. Mary's Hospital for a follow up on her cancer (Tr. at 144-145). She noted right arm discomfort which Dr. Keleti attributed to muscle strain.

On October 21, 2003, plaintiff began physical therapy for her right shoulder pain (Tr. at 150).

On November 5, 2003, physical therapist Katy Rush, completed a progress report (Tr. at 147, 227). Plaintiff had stated, "I consider my stretching to be whenever I pick up anything in my house." Ms. Rush questioned whether plaintiff was performing her stretching exercises properly at home.

On November 6, 2003, plaintiff had a mammogram done on her right breast at Truman Medical Center (Tr. at 124, 126, 196). The impression was stable right mammogram without evidence of developing malignancy.

20

On November 21, 2003, plaintiff was discharged from physical therapy (Tr. at 146, 226). She had reported that she feels better for a while after physical therapy, but it does not last long. After noting inconsistent progress, Katy Rush, the physical therapist, recommended that plaintiff return to see her doctor.

On December 19, 2003, plaintiff was seen at Truman Medical Center due to a cough and sore throat (Tr. at 128). The doctor noted that plaintiff reported tenderness on skin creases near her mastectomy and that she still had a port-a-cath. Plaintiff was taking Paxil, Celebrex, and an Albuterol inhaler.

Also on December 19, 2003, plaintiff was seen by Daniel Keleti, M.D., at St. Mary's Hospital for a follow up on her cancer (Tr. at 141-142). She reported experiencing arthritic pain in the right shoulder.

On May 4, 2004, plaintiff was seen at Truman Medical Center for chronic obstructive pulmonary disease and for a pre-op evaluation (Tr. at 216). Plaintiff was finished with her chemotherapy treatment and needed to have the port-a-cath removed.

On May 20, 2004, pulmonary function testing suggested severe obstructive lung disease and moderately severe

restriction of the volume excursion of the lung (Tr. at 221). After Bronchodilator, total expired volume increased and one-second expired volume increased.

On May 26, 2004, plaintiff was seen at Truman Medical Center (Tr. at 215). The doctor assessed severe chronic obstructive pulmonary disease, but cleared plaintiff for surgery.

On June 14, 2004, plaintiff had her port-a-cath removed (Tr. at 213). The assessment states that plaintiff was doing well and that she should follow up as needed.

### C. SUMMARY OF TESTIMONY

During the June 22, 2004, hearing, plaintiff testified; and Marianne Lumpe, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 57 years of age and is currently 59 (Tr. at 235). Plaintiff has a high school education (Tr. at 236). At the time of the hearing she had been married for 33 years (Tr. at 240). Her husband works at the Heritage Form, a residential care center for disabled boys (Tr. at 252).

Plaintiff last worked in 1991 (Tr. at 241). Her past employment includes cooking and scrubbing floors at a

nursing home and washing dishes at a truck stop (Tr. at 241-242).

Plaintiff has trouble raising her arms over her head because of arthritis in her right arm and she had surgery to remove lymph nodes from the left side (Tr. at 236). Plaintiff takes Celebrex for her arthritis and she takes Tylenol for pain (Tr. at 239). She takes Skelaxin to relax her muscles (Tr. at 239). She does not get long-term relief from her medications (Tr. at 240). Plaintiff takes showers and hot baths, she uses a heating pad, and she has a rock pad she puts in the microwave to try to get relief from her pain (Tr. at 240).

Plaintiff can lift maybe five or ten pounds (Tr. at 243). Plaintiff has trouble walking because of her knees and her breathing problems (Tr. at 243-244). Plaintiff used to smoke but she quit 20 years ago (Tr. at 244). She thinks she could walk about a half a block at a time (Tr. at 244). Plaintiff can stand for about a half hour before her back starts hurting (Tr. at 245). Plaintiff can sit for about an hour before her back starts hurting (Tr. at 245). Going up stairs is a problem because of her knees and breathing problems (Tr. at 245). She can bend, but it hurts her chest (Tr. at 245-246). Plaintiff also cannot lie straight

23

because of the muscles pulling in her chest (Tr. at 246).
Plaintiff's hand gets tired quickly if she tries to write a
letter (Tr. at 253).

Plaintiff takes Paxil for depression (Tr. at 247).
Plaintiff will start crying for no reason, even when she is
walking through a grocery store (Tr. at 247). She has been
taking Paxil since 1991 (Tr. at 248). Plaintiff has
problems remembering dates and driving directions (Tr. at
249). Plaintiff sleeps about four or five hours at night
and does not sleep during the day (Tr. at 250). Plaintiff
has trouble sleeping because of things on her mind and she
cannot get comfortable because of the muscles pulling in her
chest (Tr. at 250-251).

Plaintiff does dishes but her husband puts dishes away
because plaintiff cannot reach overhead (Tr. at 251-252).
Plaintiff's husband usually does the grocery shopping (Tr.
at 252).

**2.    Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the
request of the Administrative Law Judge.

The vocational expert testified that plaintiff's past
relevant work consists of a kitchen helper, unskilled medium
level work (Tr. at 254).

24

The ALJ's first hypothetical included a person who can lift and carry 100 pounds occasionally and 50 pounds frequently; can stand, walk, and sit six to eight hours per day; can perform simple, repetitive one- and two-step tasks; can maintain attention and concentration; can maintain persistence and pace; can relate to and interact with others; can adapt to usual changes in work settings; and can adhere to safety rules (Tr. at 255). The person must avoid concentrated exposure to pulmonary irritants and repeated overhead reaching (Tr. at 255). The vocational expert testified that such a person could return to plaintiff's past relevant work as a kitchen helper (Tr. at 255).

The second hypothetical involved a person who could lift and carry ten pounds maximum, could stand for one hour at a time, could walk less than one block, could sit for one hour at a time, could not reach overhead bilaterally, must avoid concentrated exposure to pulmonary irritants, can occasionally climb and bend, and would occasionally experience difficulty with past and recent memory (Tr. at 255-256). The vocational expert testified that such a person could not return to plaintiff's past relevant work and could perform no other work in the economy (Tr. at 256).

25

## V.  FINDINGS OF THE ALJ

Administrative Law Judge James Berry entered his opinion on September 1, 2004 (Tr. at 13-19).  At step one of the sequential analysis, the ALJ found that plaintiff has not worked since her alleged onset date (Tr. at 14).  At step two, he found that plaintiff has the following severe impairments:  chronic obstructive pulmonary disease, carcinoma of the left breast, bilateral shoulder pain, and generalized anxiety disorder (Tr. at 15).  He found that her low back pain and right knee pain are nonsevere (Tr. at 15).  At step three, he found that these severe impairments do not meet or equal a listed impairment (Tr. at 15).

The ALJ found plaintiff not credible, and after reviewing the medical evidence, found that plaintiff retains the residual functional capacity to lift 50 pounds frequently and 100 pounds occasionally, to stand or walk for six to eight hours per day, and to sit six to eight hours per day (Tr. at 17).  He found that plaintiff must avoid concentrated exposure to pulmonary irritants, i.e., dust, smoke, chemical fumes, and temperature extremes (Tr. at 17).  She can only occasionally reach overhead with her arms (Tr. at 17).  She has the mental ability to perform repetitive tasks involving one- and two-step instructions; to maintain

26

attention and concentration, persistence and pace; to relate and interact with others; to adapt to usual changes in the workplace; and to adhere to safety rules (Tr. at 17).

The ALJ found that with this residual functional capacity, plaintiff can return to her past relevant work as a dishwasher/restaurant worker (Tr. at 17). Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956

27

F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are purely

related to the medical evidence. The ALJ stated that,
"[t]he claimant's subjective complaints have been considered
under the criteria set forth in 20 CFR 416.929." (Tr. at
15). He then cited medical evidence regarding her chronic
obstructive pulmonary disease, her range of motion, her
breast cancer, and her mental impairment. He concluded
with:

> Based on the above clinical and x-ray findings and the
> nature and frequency of her medical treatment, dosage
> and type of medications, an absence of any further
> diagnostic studies or surgery for her right shoulder
> pain, an absence of psychiatric findings that would
> preclude work, an absence of any mental health or
> psychological treatment and the claimant's numerous
> daily activities, it is not credible that her
> limitations are as severe as she has alleged. In fact,
> no examining or treating physician has noted any
> specific mental or physical limitations. Dr. Chatain
> noted the possibility of faking.

(Tr. at 16).

## 1. PRIOR WORK RECORD

Although the ALJ did not elaborate on plaintiff's prior
work record, I note that this factor supports his assessment
of her credibility. Plaintiff has had earned income during
only 14 of the 30 years prior to her alleged onset date. In
many of those years, her earned income was negligible.
Plaintiff's average annual earnings for those 14 years is
$1,715.33. That averages out to weekly earnings of $32.98.

29

This suggests that plaintiff's lack of employment is not necessarily due to her impairment.

In addition, plaintiff told Dr. King in 2002 that she had last worked in 1991 (four years before her alleged onset date), and had not looked for work since that time.

## 2. *DAILY ACTIVITIES*

There is little evidence in the record of plaintiff's daily activities. She testified that she does the dishes, but her husband puts the dishes away if they need to go in overhead cabinets. She does her "housework and chores", watches television, and plays computer games during the day. Despite the fact that the majority of her day is spent, according to her, watching television and playing on the computer, she testified that she is only able to sit for about an hour before her back starts hurting. Her testimony seems to contradict her alleged daily activities. In addition, there is no allegation in any of plaintiff's medical records of back pain.

## 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Although plaintiff claims that her pain and depression are disabling and have been since January 1, 1995, there are lengthy periods when she sought no medical treatment. Plaintiff told Elizabeth Page in November 2002 that she

30

functions pretty well when she is taking her Paxil.  Dr.
Casey noted that plaintiff does well with her depression on
Paxil.  Dr. King found that working outside the home would
help plaintiff's depression.  Dr. Sutton found no severe
mental impairment.

Plaintiff's doctors have recommended shoulder exercises
and physical therapy for her physical pain, and they have
prescribed non-steroidal anti-inflammatories, which suggests
that her pain is not disabling.  X-rays in April 2003 showed
no pulmonary abnormality.  Although tests have established
that plaintiff has degenerative joint disease, she has never
been prescribed anything stronger than a non-steroidal anti-
inflammatory for the pain resulting from the degenerative
joint disease.  In September 2003, plaintiff had "slight
discomfort" of her right shoulder during rotation.  X-ray of
right shoulder was unremarkable, and plaintiff reported that
Celebrex, an anti-inflammatory, helps relieve her shoulder
pain.  In October 2003, Dr. Pickett found that plaintiff had
minimal degenerative changes in her shoulder, she had
symmetrical range of motion in both shoulders, and she could
abduct her shoulders approximately 170 degrees.

The duration, frequency, and intensity of plaintiff's
symptoms do not support a finding of disability.

31

### 4. PRECIPITATING AND AGGRAVATING FACTORS

There are no precipitating or aggravating factors in the record.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

As mentioned above, plaintiff has been treated very conservatively for her impairments. She has been prescribed Paxil for her depression which she states works well. She has not been to a psychologist or a psychiatrist, has not been hospitalized, and has not been treated with a variety of medications or doses. Her shoulder and knee pain have been treated with exercises and non-steroidal anti-inflammatories. Plaintiff's cancer was treated with surgery, chemotherapy, and radiation and the medical records state that she no longer has a malignancy. Finally, there are substantial periods of time in the record when plaintiff was not seeking medical treatment for any of her impairments.

### 6. FUNCTIONAL RESTRICTIONS

The record does not reflect that any doctor has ever restricted plaintiff's physical activities. In fact, after her alleged onset date, plaintiff told her doctor that she was "on her feet all day and did a lot of lifting". The record suggests that if plaintiff's physical activities are

32

restricted, it is not at the recommendation of her doctors but because of her own choice to limit her activities.

## B. *CREDIBILITY CONCLUSION*

Based on all of the above factors, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit plaintiff's allegations of disabling pain and depression.

## VII. *PLAINTIFF'S MENTAL IMPAIRMENT*

Plaintiff next argues that although the ALJ found that plaintiff's generalized anxiety disorder is severe, he failed to account for any mental limitations in plaintiff's residual functional capacity.

The ALJ noted that Dr. Chatain found that plaintiff's personality testing suggested a moderate "fake bad" response, and her responses and demeanor were generally normal but anxious.  She was on a low dose of Paxil for her mental impairment.  Dr. Chatain found that plaintiff was psychologically impaired based on anxiety, but she did not describe the degree or what areas of functioning were impaired.  Two state agencies physicians found no severe mental impairment.  Plaintiff admitted to Disability Determinations that she functions well when she takes her Paxil.  She has had no hospitalizations, no treatment by a

psychiatrist, no treatment by a psychologist, and no severe mental symptoms. Plaintiff's husband called Dr. Casey and reported that plaintiff had not slept for four days and was staring at the wall crying. Dr. Casey suggested he take plaintiff to an urgent care center or the ER; however, the medical records do not reflect that plaintiff actually sought that medical treatment. I also note that this call to Dr. Casey came on November 3, 2002 -- less than one week after Dr. King found that working outside the home would help plaintiff's depression. There is no other allegation in the entire record that Paxil did not work to control plaintiff's depression and anxiety.

Although the ALJ found that plaintiff's generalized anxiety disorder is severe, it seems that he was giving plaintiff the benefit of the doubt. The substantial evidence in the record as a whole does not support a finding that plaintiff's residual functional capacity includes any restrictions more severe than that found by the ALJ.

## VIII. VOCATIONAL EXPERT TESTIMONY

Finally, plaintiff argues that the testimony of the vocational expert is not supported by substantial evidence because there is no evidence to support the ALJ's finding that plaintiff can lift 100 pounds occasionally and 50

34

pounds frequently, that she can sit, stand, or walk for six to eight hours per workday, or that she has no limitations caused by her mental impairment.

As discussed above, there is nothing in the record suggesting any lifting restrictions, any sitting restrictions, any walking restrictions, or any standing restrictions. Plaintiff testified that she functions well on Paxil, which supports the ALJ's finding that plaintiff does not have additional restrictions based on her mental impairment.

It is plaintiff's burden to prove her residual functional capacity. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The ALJ, using all of the credible evidence in the record, found that plaintiff's residual functional capacity permitted a range of heavy work except for the limitations noted in her RFC. This RFC allows plaintiff to perform her previous job of dishwasher/ restaurant worker, a medium exertion job, either as she performed it or as it is commonly performed in the national economy.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding

that plaintiff is not disabled.  Therefore, it is

 ORDERED that plaintiff's motion for summary judgment is

denied.  It is further

 ORDERED that the decision of the Commissioner is

affirmed.

         /s/ Robert E. Larsen
         ROBERT E. LARSEN
         United States Magistrate Judge

Kansas City, Missouri
April 17, 2006